UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PAULA SUE SMITH-GEORGE,

                Plaintiff,                        Civil Action No. 10-cv-14531

        v.                            District Judge Lawrence P. Zatkoff
                                          Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [9, 10]**

      Plaintiff Paula Sue Smith-George brings this action pursuant to 42 U.S.C. § 405(g) challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under the Social Security Act. Both parties filed summary judgment motions (Dkts. 9, 10), which are presently before this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) (Dkts. 2, 8).

**I.  RECOMMENDATION**

      For the reasons set forth below, this Court finds that the administrative law judge provided the vocational expert with a hypothetical that accurately reflected Plaintiff's limitations. Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be DENIED, that Defendant's Motion for Summary Judgment be GRANTED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be AFFIRMED.

## II.  REPORT

### A.  Procedural History

On April 23, 2007, Plaintiff protectively filed an application for DIB asserting that she became unable to work on November 2, 2006.  (Tr. 9, 91.)  The Commissioner initially denied Plaintiff's disability application on August 16, 2007.  (Tr. 9, 54.)  Plaintiff then filed a request for a hearing, and on October 16, 2009, she appeared with counsel before Administrative Law Judge ("ALJ") Joanne E. Adamczyk who considered the case *de novo*.  (Tr. 22-50.)  In a December 11, 2009 decision, the ALJ found that Plaintiff was not disabled.  (Tr. 9-16.)  The ALJ's decision became the final decision of the Commissioner on September 10, 2010 when the Appeals Council denied Plaintiff's request for review.  (Tr. 1.)  Plaintiff filed this suit on November 15, 2010. (Dkt. 1.)

### B.  Background

Plaintiff previously worked as an assembler in an automotive parts factory; in February 2000, she sustained an injury to her right shoulder when a tool slipped.  (Tr. 119-21, 170, 184.)  Plaintiff last worked in November 2006.  (Tr. 119, 134.)  Plaintiff is married, has two children, and was 36 years old on her disability onset date and 39 at the time of the ALJ's decision.  (Tr. 127, 150.)  She has an associate's degree, and was, at the time of the ALJ's decision, taking classes towards a bachelor's degree.  (Tr. 25.)

#### 1.  The Hearing Before The ALJ

##### (a)  Plaintiff's Testimony

At the hearing before the ALJ, Plaintiff testified about her right, dominant arm limitations. She explained that she had surgery on the arm, and at one point, she had bone spurs in her shoulder

"that were over two inches long." (Tr. 28.) She testified that she does "very little" with her right arm, "just enough so it doesn't get stiff[] but . . . nothing on any repetitive basis." (Tr. 28.) When the ALJ asked Plaintiff if she could reach in front of herself with her right arm, she testified that "[a]nything above my chest level . . . [the arm] sort of gets stuck and hurts." (Tr. 42; *see also* Tr. 47.) She explained that she is unable to take her own class notes. (Tr. 25, 28.) On the day of the hearing, Plaintiff's arm pain was about an eight on a one-to-ten scale (with ten corresponding to going to the hospital for treatment). (Tr. 38.) She explained that her pain did not prevent her from walking so long as she was able to put her arm "next to [her] for a while, [for example,] put my hand in a pocket." (Tr. 35.)

Plaintiff also testified about the treatment she received for her arm pain. She said that she took Vicodin three times per day, which makes her "quite tired," and occasionally Naprosyn. (Tr. 27, 37.) She also said she took Tylenol PM and Benadryl as sleep aids. (Tr. 38.) Plaintiff explained that she used a transcutaneous electrical nerve stimulation ("TENS") unit "a couple times a day." (Tr. 39.)[1] In the past, Plaintiff had cortisone shots but received "no relief whatsoever." (Tr. 41.)

As for activities of daily living, Plaintiff testified that she folds clothes when she can, does some dishes with her left arm and minimal cooking, but does not sweep or vacuum. (Tr. 30-31.) Plaintiff explained that her computer use was limited to a half-hour. (Tr. 32.) Plaintiff testified that on a typical day, she takes her children to school, returns home, and naps. (Tr. 34.) She then

---

[1]"Transcutaneous electrical nerve stimulation (TENS) is a therapy sometimes used to treat localized or regional pain. During TENS therapy, electrodes deliver electrical impulses to nearby nerve pathways — which can help control or relieve some types of pain." April Chang-Miller, M.D., Mayo Clinic Rheumatologist, Online Response to "Would a TENS unit help improve fibromyalgia pain?" (Feb. 3, 2011) *available at* http://www.mayoclinic.com/health/tens/AN01946.

3

"take[s] a shower, [and] see[s] if there's anything [she] can try to maneuver around the house and do something." (Tr. 34.) She then picks up her children, helps them with their homework, and, if there is a sports activity, she will usually attend. (Tr. 34.)

*(b) The Vocational Expert's Testimony*

Vocational Expert ("VE") Ann Trumbly also testified at Plaintiff's hearing. The ALJ asked her to consider a hypothetical person of Plaintiff's age, education, and work experience limited to sedentary work with a number of functional limitations including: lifting no more than five pounds with the dominant right arm and ten pounds with the left, no reaching overhead with the right arm or above "waist level"with either arm, and no repetitive fingering with the right arm. (Tr. 47.) The VE testified that there would be sedentary, unskilled work that the hypothetical individual could perform: security monitor (600 jobs in the region), credit clerk (700 jobs), and general officer clerk (2,500 jobs).

Plaintiff's counsel conducted limited cross examination of the VE. In particular, he asked the VE to consider the same hypothetical individual but further limited as follows: no use of the right shoulder and both of the individual's hands had to remain within 14 inches of the individual's body. (Tr. 49.) The VE testified that those additional limitations would preclude work. (Tr. 49.)

*2. Medical Evidence*

On October 28, 2003, Plaintiff had her first of many visits with Dr. Waldomar Roeser, an orthopedic surgeon. (Tr. 213.) Plaintiff reported that she had tried to work "on and off" since 2001 but had been unable to do so because of her shoulder. (Tr. 213.) She reported pain when lifting items above chest level, weakness, and night pain. (Tr. 213.) Dr. Roeser found that the area directly over Plaintiff's acromioclavicular joint was tender, that her shoulder forward flexion was limited

4

to 110 degrees, and that she could internally rotate her arm to above the belt.  (Tr. 213.)  Plaintiff had

pain during external shoulder rotation but her strength in this movement was nearly 5 out of 5.  (Tr.

213.)  Dr. Roeser treated Plaintiff with a shoulder injection, recommended a course of physical

therapy, and provided a work restriction of "no use of the right arm."  (Tr. 214.)

In December 2003, Dr. Roeser noted that Plaintiff had gained "about a week's benefit" from

the injection before it wore off.  (Tr. 211.)  He also discussed with Plaintiff the possibility of

shoulder surgery.  (Tr. 212.)  Dr. Roeser's work restrictions limited Plaintiff to lifting no more than

five pounds.  (Tr. 212.)

Plaintiff underwent shoulder surgery in January 2004. (Tr. 163.)  Specifically, Plaintiff had

"an open distal clavicle excision and acromioplasty and subacromial decompression."  (Tr. 163.)

Plaintiff saw Dr. Roeser for post-operative visits in February and March 2004, and in April 2004,

he noted that it would be about four to six months post-surgery before Plaintiff could work.  (Tr.

203.) In June 2004, Dr. Roeser noted that Plaintiff was "not ready to return to work yet" and should

continue with her shoulder strengthening program.  (Tr. 201.)

In July 2004, Dr. Roeser found that Plaintiff had the following range of movement in her

right shoulder: flexion and abduction to 180 degrees with "external rotation of 45 degrees and

internal rotation to the level of T12."  (Tr. 200.)  He also noted that Plaintiff had "good strength" in

internal rotation, external rotation, and "mild discomfort" on abduction.  (Tr. 200.)  Dr. Roeser

provided Plaintiff a note with a return to work date of July 28, 2004, with restrictions of no repetitive

or overhead activity, and no lifting greater than 20 pounds.  (Tr. 200.)

But in September 2004, Dr. Roeser noted that Plaintiff's job required her to lift 30 to 40

pounds to chest level "almost 300 times per shift."  (Tr. 199.)  He opined that Plaintiff could not

successfully return to work given the strenuous nature of her job. (Tr. 199.) He therefore prescribed physical therapy, and provided another disability form with the same restrictions as before: lifting no more than 20 pounds, no repetitive movements, or overhead activity. (Tr. 199.)

In November 2004, Dr. Roeser noted that Plaintiff's strength was steadily increasing, but he prescribed two more months of physical therapy and work disability. (Tr. 198.) Plaintiff was "saddened to learn that she still could not go back to work as she [was] very interested in getting back into the work force." (Tr. 198.)

In January 2005, Dr. Roeser prescribed a TENS unit. (Tr. 197.) He discussed returning to work with Plaintiff, but Plaintiff told Dr. Roeser that her employer would not allow her to return if she had any upper extremity restrictions. (Tr. 197.) He recommended that Plaintiff could return to work with a 15 pound lift limitation, but if that restriction could not be accommodated, Plaintiff would have to wait until her strength increased. (Tr. 197.)

In April 2005, Dr. Roeser found that Plaintiff had full range of motion in both arms – active and passive. (Tr. 196.) He noted that tenderness over the acromioclavicular joint had reduced dramatically. (Tr. 196.) Dr. Roeser concluded that Plaintiff was "ready for her return to work with no activity restrictions," but added that it was "a trial." (Tr. 196.)

The trial period revealed limitations. In June 2005, Plaintiff reported to Dr. Roeser that she was experiencing pain in her right shoulder and was "unable to do the repetitive right upper extremity work required by her present job." (Tr. 195.) Dr. Roeser placed Plaintiff on the following permanent restrictions: "no repetitive use of her right arm, no overhead use, and no lifting greater than 15 to 20 pounds on a repetitive basis." (Tr. 195.)

In December 2005, Plaintiff returned to Dr. Roeser. (Tr. 162, 194.) She was having

6

"difficulty with repetitive motion at work, such as turning parts over[,] as well as reaching out for an extended period of time."  (Tr. 162.)  At Plaintiff's request, Dr. Roeser increased her work restrictions to a "maximum lifting of 5 pounds with limited repetitive and reaching activity."  (Tr. 162.)  He advised, however, that Plaintiff "would be a good candidate for job retraining," and that if Plaintiff required further details regarding her work restrictions, she would need to undergo a functional capacity exam elsewhere: "we do not do that [type of] occupational exam in this office." (Tr. 162.)

In July 2006 Plaintiff had what appears to be her first visit with Dr. Ruth Licht.  (*See* Tr. 170.)  Based on treatment records from Dr. Licht pertaining to conditions unrelated to Plaintiff's shoulder, it appears that Dr. Licht was Plaintiff's primary-care physician.  On July 19, 2006, Dr. Licht indicated that Plaintiff's right shoulder was tender and swollen at the acromioclavicular joint and that Plaintiff had pain during shoulder extension and abduction.  (Tr. 170.)  The "treatment" portion of Dr. Licht's notes indicates "[r]estrictions at work until [she] sees [the University of Michigan] doctor."  (Tr. 170.)  It appears that Dr. Licht was referring to Dr. Roeser who is a Clinical Assistant Professor with the University's MedSport Clinic.  (Tr. 207.)

About a week later, on July 28, 2006, Plaintiff returned to Dr. Roeser.  (Tr. 163; *see also* 191-92.)  She stated that was having persistent right shoulder pain.  Dr. Roeser noted that Plaintiff had been placed on work restrictions but there had been "questionable" compliance by her employer. On exam, Dr. Roeser found that Plaintiff had active forward flexion to 160 degrees, external rotation to 45 degrees with four-out-of-five strength.  (Tr. 163.)  Dr. Roeser reviewed radiographs that showed "postoperative change at the distal clavicle [but] no new osteophytes or degenerative changes."  (Tr. 163, 218.)  Plaintiff also brought with her a note from her primary care physician,

presumably Dr. Licht, that provided the following work restrictions: no use of the right shoulder, a lift limit of five pounds, no overhead use, and keeping hands within 14 inches of the body. (Tr. 163.) Dr. Roeser provided, "[w]e do recommend and agree with the patient's primary care physician that she should be on permanent restrictions of no overhead use and 5-pound lifting limit." (Tr. 163.)

In October 2006, Plaintiff saw Dr. Licht and reported pain from lifting weight above 20 pounds and repetitive movement. (Tr. 168.) She found that Plaintiff had a decreased range of motion in her right shoulder and increased pain during abduction. (Tr. 168.) Dr. Licht gave Plaintiff a "work restriction" slip but it is not in the record. (Tr. 168.)

On February 22, 2007, Dr. Licht prescribed the following work restrictions: "No repetitive use of right arm. No lifting above shoulder level and no lifting over 5 [pounds]." (Tr. 179.) She noted that "[t]hese restrictions [were] permanent." (Tr. 179.)

On March 5, 2007, Suzanne Boltach, RN, ONC, CN, (registered nurse; orthopedic nurse, certified; clinical nurse) completed a "nursing note" entitled "Proof of Disability." (Tr. 176; *see also* Tr. 178, 191.) It appears that Boltach worked in Dr. Roeser's group at the University of Michigan. (Tr. 176.) She diagnosed Plaintiff with "[r]ight shoulder degenerative joint disease" and provided the following "permanent" restrictions: "No use of right shoulder. No repetitive overhead activity. No heavy lifting. No pushing or pulling. Limit 5 lbs, only. Keep hands 14 [inches] . . . to body." (Tr. 176.)

On May 31, 2007, Dr. Licht noted that Plaintiff's shoulder had been "hurting more lately" and prescribed Vicodin and Darvocet for pain. (Tr. 252.)[2]

---

[2]This was Plaintiff's first medical treatment after filing her application for DIB.

8

The next day, Plaintiff, on referral from Dr. Licht, had her first visit with Dr. Paul LaClair, a specialist in physical medicine and rehabilitation. (Tr. 184-85; *see also* Tr. 274-75.) Plaintiff reported "numbness and tingling through the right arm" and that she was taking Vicoden twice a day and Darvocet once a day. (Tr. 184.) Dr. LaClair found that Plaintiff's right shoulder range of motion was "moderately limited with flexion and abduction being 90 [degrees]" and that there was "give way" weakness in Plaintiff's "shoulder abductors, external rotators and flexors on the right due to reproduction of pain." (Tr. 184-85.) He noted that Plaintiff had been off work as her "employer [could not] accommodate her restrictions which include a 5 pound lift limit with the right arm, no reaching more than 14 inches, no pushing or pulling with the right arm, and no above shoulder level lifting or reaching." (Tr. 184.) Dr. LaClair agreed with these work restrictions. (Tr. 185.)

On July 9, 2007, Dr. Licht noted that Plaintiff had "no change in shoulder pain[;] cannot even use computer for more than [five minutes]." (Tr. 251.) She noted that Plaintiff "remains disabled from work (usual occupation or any job requiring use of [right] shoulder)." (Tr. 251.)

On July 30, 2007, Dr. LaClair saw Plaintiff for a follow-up on her "right shoulder, arm and hand complaints" but also noted that Plaintiff had been diagnosed with carpal tunnel syndrome in the "remote past." (Tr. 272.) He found that Plaintiff had 110 degrees of active right shoulder abduction, but her left shoulder abduction was full. A "Hawkins test" was positive on the right but negative on the left. He recommended electrodiagnostic testing on the Plaintiff's right arm to evaluate carpal tunnel syndrome. (Tr. 272.)

On August 13, 2007, Heather Martincheck completed a review of Plaintiff's medical file on behalf of the Social Security Administration and also completed a Physical Residual Functional

Capacity Assessment.  (Tr. 227-34.)  She noted medical records from Drs. Licht, Roeser, and LaClair, and found that Plaintiff could lift 20 pounds occasionally, 10 pounds frequently, and stand or walk for 6 hours in an eight-hour day.  She further indicated: "No pushing or pulling on the right upper extremity.  Left upper extremity is unrestricted.  Limit [five] pounds lifting/carrying on the right, left upper extremity is limited to frequently lifting/carrying 10 pounds and occasional lifting/carrying 20 pounds."  (Tr. 228.)  She also found that Plaintiff had a number of postural and manipulative limitations.  (Tr. 229-30.)  She further indicated that claimant had a medical determinable impairment "that could easily be expected to cause [her symptoms]. . . . [The claimant's] statements are considered credible."  (Tr. 232.)

In October 2007, Plaintiff reported to Dr. Licht that her shoulder pain was an eight or nine on a ten scale.  (Tr. 248.)  She opined that Plaintiff "will never be able to return to [her] previous job."  (Tr. 248.)  In November 2007, Dr. Licht noted that Plaintiff's right shoulder condition was "unchanged."  (Tr. 245.)

Plaintiff returned to Dr. LaClair in November and December 2007.  (Tr. 271.)  He noted that a recent shoulder x-ray did not reveal any abnormality other than "distal clavicle resection."  (Tr. 272; *see also* Tr. 258.)  Dr. LaClair remarked that electrodiagnostic testing was normal.  (Tr. 271.)  He refilled Plaintiff's Vicodin prescription and added a prescription for Elavil to help Plaintiff sleep better.  (Tr. 271.)   In December, Dr. LaClair found that a very recent MRI indicated "some signal change in the supraspinatus, but no evidence of retraction."  (Tr. 269.)  He arranged for physical therapy and noted that Plaintiff was headed on vacation.  (Tr. 269.)

Plaintiff returned to Dr. LaClair for treatment in January and February 2008.  In January , Dr. LaClair indicated that Plaintiff was tolerating the use of Vicodin "well," and that she had

10

discontinued a prescription sleep aid in favor of Benadryl.  (Tr. 268.)   The next month, he stated that Plaintiff's permanent restrictions were as follows: "a 5 pound maximum lift [limit] with the right arm, no repetitive pushing or pulling with the right arm, no reaching more than 18 inches with the right arm, and no above shoulder level lifting with the right arm."  (Tr. 267.)

In May 2008, Plaintiff reported to Dr. Licht that any use of her shoulder during daily activities caused pain.  (Tr. 240.)  Dr. Licht found that Plaintiff's pain restricted her to 90 degree abduction and extension, and that Plaintiff was unable to internally rotate her shoulder.  (Tr. 240.)  Dr. Licht opined that Plaintiff remained "unable to work" and instructed Plaintiff to continue her physical therapy.  (Tr. 240.)

In August 2008, Plaintiff saw both Drs. LaClair and Licht.  Dr. LaClair commented that Plaintiff's symptoms "have been stable."  (Tr. 256.)  He noted very similar permanent restrictions as in February: the only change was a slightly reduced 14-inch reach limitation.  (Tr. 256.)  About a week later, Dr. Licht similarly remarked that Plaintiff's shoulder condition had not changed.  (Tr. 237.)  Plaintiff reported to Dr. Licht that her pain level was a constant "5" and escalated up to "10" during activity.  (Tr. 237.)

Plaintiff next saw Dr. LaClair in November 2008.  (Tr. 264; *see also* Tr. 282.)  He noted stable symptoms and that Plaintiff was using Benadryl as a sleep aid.  (Tr. 264.)  Dr. LaClair prescribed the same work restrictions as in August 2008.  (Tr. 264.)

The record reflects that Plaintiff visited Dr. LaClair three times in 2009.  (Tr. 261-63.)  It appears Plaintiff's shoulder condition remained essentially constant.  The most recent office note in the record from Dr. LaClair is dated July 17, 2009.  (Tr. 261.)  It provides limitations very similar to those prescribed to Plaintiff after her first visit with Dr. LaClair some two years earlier: "5 pound

maximum lift with the right arm, no pushing, pulling, lifting or repetitive use of the right arm, no reaching more than 14 inches from the body with the right arm and no work at or above shoulder level with the right arm." (Tr. 261.)

On August 18, 2009, Dr. Licht noted that Plaintiff "remains unable to work." (Tr. 276.) It appears, however, that this statement was directed to Plaintiff's then-present job; the month prior Plaintiff had seen the automotive-plant physician about her restrictions. (Tr. 261.)

### C. Framework for Disability Determinations

Under the Social Security Act (the "Act"), Disability Insurance Benefits (for qualifying wage earners who become disabled prior to expiration of their insured status) are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

12

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

See 20 C.F.R. §§ 404.1520, 416.920; see also Heston v. Comm'r of Soc. Sec., 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . .   If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [defendant]." Preslar v. Sec'y of Health and Human Servs., 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.  The Administrative Law Judge's Findings

At step one, ALJ Adamczyk found that Plaintiff had not engaged in substantial gainful activity since November 2, 2006 – Plaintiff's alleged onset date. (Tr. 11.) At step two, she found that Plaintiff had the following severe impairments: "degenerative joint disease of right shoulder – status post torn right [acromioclavicular] joint, right shoulder impingement and obesity." (Tr. 11.) Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (Tr. 11.) Between steps three and four, she determined that Plaintiff had the residual functional capacity to perform sedentary work with a number of specific restrictions that will be discussed in more detail below. (Tr. 11.) At step four, the ALJ found that Plaintiff could not perform any past relevant work. (Tr. 15.) At step five, the ALJ relied on VE testimony in response to her hypothetical, and found that work existed in significant numbers that Plaintiff could perform: security monitor, credit clerk, and general officer clerk. (Tr. 15-16.)

### E.  Standard of Review

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." (internal quotation marks omitted)).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted); *see also Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted) (explaining that if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole.  *Bass*, 499 F.3d

14

at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." (internal quotation marks omitted)). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

### F. Analysis

Plaintiff raises a single issue on appeal. She argues that the ALJ failed to provide the VE with a hypothetical that accurately portrays Plaintiff's physical limitations, and therefore, the VE's testimony about job availability was not substantial evidence for the ALJ to rely upon at step five of the disability determination. (Pl.'s Mot. Summ. J. at 6-8.)

The ALJ proposed the following hypothetical individual to the VE:

> ALJ: I want you to assume a person of the claimant's age, education and work experience, who is limited to sedentary work, lifting up to no more than 5 pounds with the dominant right extremity, and up to 10 pounds with the left upper extremity, who needs the ability to change positions approximately every 30 minutes, and who cannot climb ladders, ropes or scaffolds, occasionally climb stairs with a rail, cannot do any overhead reaching with the right upper extremity, and no reaching above . . . . What did you say, waist level, ma'am?
>
> CLMT: About that, yeah.
>
> [ALJ:] With either extremity. . . . Who cannot perform work that

15

requires repetitive fingering with the right extremity, and only occasional handling up to five pounds with the right extremity. . . . Ms. George, do you have limitations with repetitive use of the left arm as well?

CLMT:  No, not until I overuse it.

ALJ: Okay. . . .  So we can say frequent, but not constant use of the left upper extremity. No exposure to extremes of cold, wetness or humidity.

(Tr. 46-47.)  The ALJ then asked the VE, "Could such a person perform . . . any of the claimant's past work, or any other work that exists in the regional economy?" (Tr. 47.)  The VE responded that there would be a number of sedentary, unskilled jobs that the hypothetical individual could perform. (Tr. 47-48.)

According to Plaintiff, the above hypothetical was inaccurate (and therefore the VE's response insubstantial evidence) because the ALJ failed to give due deference to treating-source opinions.  In particular, Plaintiff asserts that her treating physicians found that she had *no* use of her right shoulder and had to keep *both* hands within 14 inches of her body.  (Pl.'s Mot. Summ. J. at 10.) And, Plaintiff points out, when the VE was asked about an individual who was additionally limited with (1) "no use of the right shoulder," and (2) "keep[ing] hands bilateral – that's plural, 14 inches only to the body," the VE responded that the sedentary jobs she had identified would be precluded. (Pl.'s Mot. Summ. J. at 10 (citing Tr. 48-49).)

For the following reasons, the Court finds that (1) the records cited by Plaintiff for support of the two additional limitations proposed to the VE (no right shoulder use and both hands close to the body) were not prepared by a treating source and therefore the ALJ had no duty to apply the treating-source analysis as to those particular opinions; and (2) to the extent that elsewhere in the record a treating physician provided such an opinion, the limitations of *no* right shoulder use and

16

*both* hands close to the body have no support in the record, and, accordingly, even if the ALJ failed to apply the treating-source analysis to those findings, the error was harmless.

Under the treating source rule, an ALJ must generally give greater deference to the opinions of treating sources than to those of non-treating sources. *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir. 2010); *see also* 20 C.F.R. § 404.1527; S.S.R. 96-2p. However, as argued by the Commissioner, the applicable regulations prescribe a particular meaning to the term "treating source." The term means the claimant's "physician, psychologist, or other acceptable medical source who provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. § 404.1502. And the term "acceptable medical source[s]" is defined as: (1) "Licensed physicians (medical or osteopathic doctors)"; (2) "Licensed or certified psychologists"; (3) "Licensed optometrists, for purposes of establishing visual disorders only"; (4) "Licensed podiatrists, for purposes of establishing impairments of the foot"; (5) and "Qualified speech-language pathologists, for purposes of establishing speech or language impairments only." 20 C.F.R. § 404.1513(a).

Here, Plaintiff asserts that Drs. Licht and Roeser – both of whom appear to be treating sources – provided that Plaintiff could not use her right shoulder and could extend neither hand beyond 14 inches from her body. (Pl.'s Mot. Summ. J. at 10.) But the medical record Plaintiff cites in support of this claim was not prepared by those physicians. (*See* Pl.'s Mot. Summ. J. at 10 (citing Tr. 176, 178).) Rather, the cited medical record was prepared by Suzanne Boltac – a registered

nurse, certified orthopedic nurse, and clinical nurse.  (Tr. 176; *see also* Tr. 178.)[3]  Ms. Boltach therefore was not a "physician, psychologist, or other acceptable medical source" within the meaning of the social security regulations.  Accordingly, the opinion cited by Plaintiff was not entitled to treating-source deference.

However, the record also indicates that a treating-source may have provided the same limitations that appear in Ms. Boltach's opinion.  In particular, it appears that in July 2006, Dr. Licht, Plaintiff's primary-care physician, may have opined that Plaintiff could not use her right shoulder and had to keep her "hands" (plural) 14 inches from her body.  (*See* Tr. 163 (discussing specific work restrictions from an unnamed "primary care physician"); Def.'s Mot. Summ. J. at 11 n.3.)  Even assuming, however, that Dr. Licht provided those limitations for Plaintiff in July 2006, any error in failing to recognize her opinion or failing to analyze it under the treating-source rule was harmless.

Although the Sixth Circuit has repeatedly held that a failure to provide "good reasons" for the weight given to a treating-source opinion readily triggers remand, *see Sawdy v. Comm'r of Soc. Sec.*, 2011 WL 3805638, at *2 (6th Cir. Aug. 29, 2011), the appellate court has also held that a failure to comply with the treating-source analysis may be harmless when the opinion is "patently deficient," *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004).  Although such situations are relatively uncommon, this is such a case.

First, if Dr. Licht in fact gave Plaintiff a no-right-shoulder-use and bilateral-arm restriction in July 2006, this would have been after she had seen Plaintiff only one time.  (*See* Tr. 170 (first

---

[3]Not only did Ms. Boltach sign the record in question, it appears among Dr. Roeser's physician records as a "nursing note."  (Tr. 190; *see also*  Tr. 176.)

18

medical record in the administrative record from Dr. Licht dated July 2006); Tr. 122 (Plaintiff indicating that she first saw Dr. Licht in August 2006).)  Accordingly, even if Dr. Licht ultimately treated Plaintiff over a prolonged period, it is doubtful that Dr. Licht's July 2006 opinion should be entitled to treating-source deference.  *See* 20 C.F.R. § 404.1527(d)(2) ("[T]reating sources . . . are likely to be the medical professionals most able to provide a detailed, *longitudinal picture of your medical impairment(s)* and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." (emphasis added)); *see also* 20 C.F.R. § 404.1527(d)(2)(ii) ("Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion.").  Moreover Dr. Licht indicated that these particular restrictions were temporary: "[r]estrictions at work until [she] sees [the University of Michigan] doctor."  (Tr. 170.)

Second, none of Dr. Roeser's records support Dr. Licht's July 2006 opinion, and, in fact, they contradict that opinion.  Prior to the date of Plaintiff's first visit with Dr. Licht, Dr. Roeser had treated Plaintiff for over two-and-a-half years.  Dr. Roeser never suggested that Plaintiff could not use her right shoulder at all; in fact, he repeatedly found that Plaintiff could do some limited lifting with her right arm and had a significant range of motion in her right shoulder.  (Tr. 162, 195, 197, 199, 200.)  Nor did Dr. Roeser ever mention any limitations with Plaintiff's left arm.  To the contrary, in 2004 he found: "Left shoulder demonstrates full passive range of motion with 5/5 strength and neurovascularly intact left upper extremity."  (Tr. 210.)  Further, in the exam immediately following Dr. Licht's July 2006 opinion, Dr. Roeser indicated that he agreed only with part of Dr. Licht's more extreme limitations: "[w]e do . . . agree with the patient's primary care

physician that she should be on permanent restrictions of no overhead use and 5-pound lifting limit." (Tr. 163 (emphasis added).)

Third, after July 2006, Dr. Licht herself gave Plaintiff less restrictive work limitations. On February 22, 2007, Dr. Licht prescribed: "No repetitive use of right arm. No lifting above shoulder level and no lifting over 5 [pounds]." (Tr. 179.) This is contradictory to a complete prohibition on right shoulder movement, and plainly does not mention Plaintiff's left arm. (Notably, this was about two weeks prior to Ms. Boltach's opinion. (*See* Tr. 176, 179.))

Fourth, Dr. LaClair, who, similar to Dr. Roeser, had treated Plaintiff multiple times over two years, provided work restrictions inconsistent with limitations of no right shoulder use and keeping both hands within 14 inches of the body. In February 2008, Dr. LaClair stated that Plaintiff's permanent restrictions were "a 5 pound maximum lift [limit] with the *right arm*, no repetitive pushing or pulling with the *right arm*, no reaching more than 18 inches with the *right arm*, and no above shoulder level lifting with the *right arm*." (Tr. 267 (emphases added).) These restrictions plainly discuss only right arm restrictions and do not suggest a left-arm impairment. Similarly, in July 2009, Dr. LaClair provided that Plaintiff's limitations were "5 pound maximum lift with the right arm, no pushing, pulling, lifting or repetitive use of the right arm, no reaching more than 14 inches from the body with the right arm and no work at or above shoulder level with the right arm." (Tr. 261 (emphasis added).) Again, implicitly, Plaintiff could use her right arm in a limited fashion (as opposed to not at all) and her left arm use was apparently unrestricted.

Fifth, Plaintiff's testimony at trial is inconsistent with the hypothetical individual Plaintiff's counsel provided the VE. Plaintiff's counsel emphasized that the 14-inch limitation applied to both arms. (Tr. 48-49.) But Plaintiff said she could "probably" lift five pounds from the floor with her

20

left arm (Tr. 36), could pass a dish at the dinner table with her left hand (Tr. 42), could lift a gallon of milk with her left arm (Tr. 35), and most tellingly, stated that she does not have limitations with her left arm "until [she] overuse[s] it," (Tr. 47.)[4]  Plaintiff's testimony is inconsistent with the fact that she could not extend her left hand more than 14 inches from her body.

In sum then, even assuming that Dr. Licht, along with Ms. Boltach, provided that Plaintiff had no use of her right shoulder and could only extend her left arm more 14 inches from her body, these opinions are not merely contradicted by substantial evidence: the overwhelming evidence in the record provides that Plaintiff was not so limited.  Accordingly, there was no reasonable basis for the ALJ to have credited their opinions that Plaintiff had no use of her right shoulder and could only extend her left arm 14 inches from her body.  Any failure to comply with the treating-source rule was therefore harmless.  The Court finds that the ALJ's hypothetical to the VE (and his RFC assessment) accurately reflects what Plaintiff can and cannot do and is supported by substantial evidence in the record.

### G.  Conclusion

For the foregoing reasons, this Court finds that the administrative law judge provided the vocational expert with a hypothetical that accurately reflected Plaintiff's limitations.  Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be DENIED, that Defendant's Motion for Summary Judgment be GRANTED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be AFFIRMED.

---

[4]And to account for overuse, the ALJ included in his hypothetical to the VE that the individual was limited to sedentary work, could only frequently (as opposed to constantly) use her left arm, and had a left-arm lifting cap of ten pounds.  (Tr. 47.)

## III.  FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.  *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97.  Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office.  *See* E.D. Mich. LR 5.1.  A copy of any objections is to be served upon this magistrate judge but this does not constitute filing.  *See* E.D. Mich. LR 72.1(d)(2).  Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response.  E.D. Mich. LR 72.1(d)(3), (4).

s/Laurie J. Michelson                                   
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated: October 27, 2011

22

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on October 27, 2011.

<u>s/ Lisa Bartlett</u>
Case Manager
